UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VALERIE L. TOLMOSOFF,<br><br>Defendant. | Case No. 6:23-po-00187-HBK-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS[1]<br><br>(Doc. No. 11) |

Pending before the Court is Defendant Valerie Tolmosoff's ("Defendant" or "Tolmosoff") Motion to Suppress.[2]  (Doc. No. 11, "Motion").  Tolmosoff was charged by Violation Notice No. E1167021 with carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation in violation of 36 C.F.R. § 2.4(c), stemming from an incident that occurred on January 16, 2023 on Northside Drive in Yosemite National Park.  (*See* Doc. No. 1, the "Citation").  Tolmosoff seeks to suppress all evidence and statements obtained from Defendant Tolmosoff and her passenger "while they were in . . . custody."  (Doc. No. 11 at 8, 13).  The Government filed an Opposition.  (Doc. No. 12).  In support, the Government refers the Court to

---

[1] This motion was referred by the district court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules 302(b)(3) and 303(a).  (E.D. Cal. 2023).

[2] Defendant's Motion had incorporated a motion to dismiss, which the Court addressed by separate order and denied.  (*See* Doc. No. 19).

two video exhibits—the body worn camera recordings of National Park Service Rangers Justin Fey and Sean Fitzgerald.  (Exhibits 2 and 3 to Doc. No. 12).  Tolmosoff elected not to file a Reply.  Defendant did not request an evidentiary hearing on the Motion and the Court deems the Motion suitable for decision without oral argument.[3]  The Court denies the Motion.

## FACTUAL BACKGROUND AND FINDINGS

The following facts are gleaned from the probable cause statement in support of the Violation Notice and Exhibits 2 and 3.  While on patrol at approximately 1230 hours on January 16, 2023, Yosemite National Park Ranger Justin Fey observed a black Cadillac obstructing traffic on Northside Drive by partially blocking the left lane of traffic in violation of 36 C.F.R. § 4.13.  (Doc. No. 1-2 at 1).  Ranger Fey parked behind the Cadillac and approached to contact the occupants.  "Immediately after exiting [the] patrol vehicle," Ranger Fey "smell[ed] the distinct odor of burnt marijuana in the air."  *Id*.

Ranger Fey approached the Cadillac.  A woman, later identified as Monique D. Hernandez ("Ms. Hernandez"), was standing about a car length away to the left of the Cadillac.  (Bodycam of Justin Fey, Ex. 2 to Doc. No. 12 at 00:34).  Ranger Fey explained the reason for the stop to Ms. Hernandez and asked her to keep her hands out of her pockets.  (*Id*. at 00:36–00:50).

As he did so, another woman, later identified as Defendant Valerie Tolmosoff, approached from where she was standing near the Merced River.  Ranger Fey asked the women, "Whose vehicle is it?"  (*Id*. at 00:50–00:51).  Ms. Tolmosoff answered, "Mine."  (*Id*. at 00:51–00:52).  Ranger Fey then asked, "Without going in it, any guns or knives in the vehicle today?"  (*Id*. at 00:53–00:55).  Both women answered, "No," with Ms. Tolmosoff adding that she had parked the vehicle at the location because she wanted to see the water.  (*Id*. at 00:56–1:00).  Ranger Fey then asked, "Any guns or knives on either of you?"  (*Id*. at 1:00–1:03).  Both women again answered, "No."  (*Id*. at 1:03–1:04).  Ranger Fey then explained, "The reason I'm going to be continuing talking to you is I can smell the odor of marijuana coming from the vehicle or coming from you," gesturing to both women, while again asking Ms. Hernandez to keep her hands out of her pockets.

---

[3] At the oral argument on the motion to dismiss, the Government represented that he and defense counsel had agreed that an evidentiary hearing on the suppression issue was not necessary.

(*Id*. at 1:04–1:10).  In response to Ranger Fey comments about marijuana being illegal on federal lands, Ms. Tolmosoff acknowledged her awareness that it was illegal.  (*Id*. at 1:23–1:30).

Ranger Fey then asked, "Without going back in the car, how much marijuana is in the car?"  (*Id*. at 1:30–1:33).  Ms. Hernandez stated, "No, I just had a little piece, a little, and I already put it out . . . I just smoked a little bit."  (*Id*. at 1:33–1:39).  Ranger Fey repeated, "Again, how much is in the car?"  (*Id*. at 1:39–1:40).  Ms. Hernandez responded that there was nothing in the car and no marijuana on her person.  (*Id*. at 1:40–1:44).

During this interaction, Ms. Tolmosoff turned to ask Ms. Hernandez, "You were just smoking right now while I was down there?"  (*Id*. at 1:38–1:40).  Ms. Hernandez answered, "Yes, I just smoked."  (*Id*. at 1:39–1:40).  Ranger Fey noted that this was not his "first time," and it seemed "real convenient" that people had used all they had as soon as he showed up, while asking Ms. Hernandez again to keep her hands out of her pockets.  (*Id*. at 1:45–1:57).  After obtaining Ms. Hernandez's consent, Ranger Fey performed a pat-down and a search of her pockets which did not produce any contraband.  (*Id*. at 2:08–3:07).

After the pat-down, Ranger Fey informed the women he would still be searching the vehicle "because it smells like it's coming from the vehicle as well."  (*Id*. at 3:34–3:38).  Ms. Tolmosoff began berating Ms. Hernandez to give up the marijuana, even suggesting the specific location ("blue . . . bag") where it was stored.  (*Id*. at 3:38–3:39, 3:50–4:10).  Ranger Fey explained he would nevertheless be searching the vehicle, noting the practice of individuals turning over "giveaway weed" to prevent discovery of more substantial amounts or other paraphernalia.  (*Id*. at 4:46–5:24).

Ranger Fey asked the women to stay put while returning to his patrol car to run Ms. Tolmosoff's vehicle registration information and call for backup to help search the vehicle.  (*Id*. at 5:24–7:33).  After about two minutes, Ranger Fey returned and explained that a vehicle search would allow the rangers to search anywhere in the vehicle where the marijuana might be stored— asking the women to be upfront about any contraband inside the vehicle.  (*Id*. at 7:33, 8:12–9:40).  Shortly thereafter, United States Park Ranger Sean Fitzgerald arrived to assist.  (*Id*. at 11:50–12:00).  After consent, a pat-down search also was performed on Ms. Tolmosoff and Ranger

1  Fitzgerald led the two women down the road away from the Cadillac so Ranger Fey could
2  perform a vehicle search.  (*Id*. at 12:10–14:00).  Prior to walking over, Ms. Hernandez made
3  comments directing Ranger Fey to where to find her bag containing marijuana cigarettes, leading
4  the Ranger to state, "I'm getting the feeling that there is something else in the car we're not
5  talking about that I'm going to find in the car."  (*Id*. at 12:56–13:31).

6        The search of the vehicle lasted about 23 minutes, leading to the discovery of a tin of pre-
7  rolled marijuana cigarettes in a blue bag, a "couple of knives," and a loaded "ghost" handgun
8  inside a red clothing bag.  (*Id*. at 14:03–36:40, 51:48–51:50; Ex. 1 at 2).  Ms. Tolmosoff
9  commented to Ranger Fitzgerald that the Cadillac contained about three days' worth of items,
10 noting "it's going to take a long time huh."  (Bodycam of Sean Fitzgerald, Ex. 3 to Doc. No. 12 at
11 2:37–3:00).  During the search, the two women stood unrestrained about 10 car lengths away
12 from the Cadillac while being overseen by Ranger Fitzgerald.  At times, Ranger Fitzgerald left
13 the two women unattended, including to retrieve jackets from the Cadillac.  (*Id*. at 7:15–7:30,
14 11:00–11:20).  Given the public location, other parkgoers can be seen on bodycam driving by the
15 scene.  (Ex. 2 at 7:50–7:52, 13:22–13:24, 37:52–37:54, 50:41–50:44).

16       While the search was ongoing, the women and Ranger Fitzgerald engaged in casual
17 discussions at times.  (*See, e.g*., Ex. 3 at 11:55–13:20).  At one point, Ranger Fitzgerald informed
18 Ms. Hernandez that she would not be going to jail if there was only marijuana.  (*Id*. at 8:00–8:10).
19 Later, Ranger Fitzgerald noted that warnings were the norm for a little bit of marijuana and that if
20 it was something else, "a ticket" would be issued.  (*Id*. at 16:45–17:20).  Ranger Fitzgerald also
21 discussed driving conditions and the Cadillac's wheels, stating, "Just thinking ahead, [Ms.
22 Tolmosoff] was going to have to take 41 or 120."  (*Id*. at 14:15–15:30).  After Ranger Fey found
23 the firearm in the trunk, he radioed to Ranger Fitzgerald who asked the women who it belonged
24 to; Ms. Tolmosoff admitted it was hers, and that she lacked either a concealed carry permit or
25 registration for the firearm.  (*Id*. at 17:35–17:47, 18:28–18:31).

26       Ms. Tolmosoff then volunteered various statements (e.g., "My fault;" "My mom's a
27 lawyer, she's going to say you're . . . dumb.").  (*Id*. at 17:53–18:11, 18:45–18:57).  When Ms.
28 Tolmosoff expressed concerns about going to jail, Ranger Fitzgerald explained to her that was

only "a possibility," later stating a ticket was also an option.  (*Id*. at 20:00–20:30).

At the conclusion of the search, Ranger Fey asked Ms. Tolmosoff to come towards his patrol car.  Ranger Fey then asked a few questions about the firearm and whether Ms. Tolmosoff had reviewed California law on proper gun storage.  (Ex. 2 at 36:50–38:07).  After the one minute back and forth, Ranger Fey explained to Ms. Tolmosoff that she would only be receiving a ticket.  (*Id*. at 38:07–38:30).  Ranger Fey did note that jail might have been appropriate in different circumstances (including better road conditions and increased staffing).  (*Id*. at 38:47–39:45).  After this three-minute interaction, Ranger Fey opened his patrol car door and started writing the firearm citation.  (*Id*. at 40:00).

The writing and issuance of the ticket took about eight minutes.  (*Id*. at 40:00–48:00).  During his explanation, Ranger Fey noted that given how strong the odor of marijuana was in the air and that the trunk "reeked" of marijuana, Ms. Tolmosoff should not "berate [Ms. Hernandez] too bad when we all knew it was in there," and asked for her thoughts on that.  Tolmosoff stated, "I agree." (*Id*. at 46:54–47:13).  After Ranger Fey issued the ticket, he and Tolmosoff began to talk about the firearm again, with Fey advising Tolmosoff that she did not "have to answer any of these questions if you don't want to." (*Id*. at 48:30–50:00).  A few minutes later, Ranger Fey walked over to Ms. Hernandez to warn her about the marijuana and noted that they were free to go on their way after he secured the knives in the trunk.  (*Id*. at 51:15–52:05).

**LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  When a search is conducted without a warrant, the analysis begins "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  For example, because there is a lesser expectation in the privacy of one's vehicle than of one's person, a warrantless search of a vehicle may be conducted if there is probable cause to believe the vehicle contains

contraband. *United States v. Ross*, 456 U.S. 798, 799 (1982). Although not applicable here, searches incident to lawful custodial arrests are also excepted from the Fourth Amendment's warrant requirement. *United States v. Robinson*, 414 U.S. 218, 235 (1973). Under the exclusionary rule, evidence obtained in violation of an individual's Fourth Amendment rights, including any "'fruit of the poisonous tree,'" is excluded from a criminal trial. *United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012); *see also Alderman v. United States*, 394 U.S. 165, 171 (1969) ("The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well." (citations omitted)). The burden of establishing that a warrantless search falls within an exception and is not violative of the Fourth Amendment falls on the Government. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied,* 510 U.S. 900 (1993) (citations omitted). For the reasons stated below, the Court finds the Government met its burden to show there was probable cause to search the vehicle.

**DISCUSSION**

Tolmosoff moves to suppress all evidence seized during the search of her vehicle and the statements made to the Rangers. (Doc. No. 11 at 8, 13). Tolmosoff does not formally dispute the validity of the initial law enforcement stopand whether Ranger Fey had reasonable suspicion to believe that a violation of the traffic laws had occurred.[4] Instead, Tolmosoff contends that rangers improperly extended the stop through extraneous questioning and lacked probable cause to search the vehicle.

**A. Whether the Ranger's Investigation Exceeded the Scope of Reasonable Suspicion**

Under the Fourth Amendment, a seizure for a traffic stop is "a relatively brief encounter," "more analogous to a so-called *Terry* stop than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (alterations

---

[4] Ranger Fey initially approached the vehicle to investigate the traffic infraction based upon his personal observation that the vehicle was blocking traffic. Tolmosoff offers reasons to explain why she was parked improperly, but she does not dispute that Ranger Fey had reasonable suspicion to perform a traffic stop. (*See* Doc. No. 11 at 3) ("The road was snow packed and the vehicle was pulled over to the left as far as it could safely go without getting stuck in a snowbank . . .").

6

omitted)). To be lawful, a traffic stop must be limited in its scope: an officer may "address the traffic violation that warranted the stop," make "ordinary inquiries incident to the traffic stop," and "attend to related safety concerns." *Id*. at 354–55 (quotations and alterations omitted). The stop may last "no longer than is necessary to effectuate" these purposes and complete the traffic "mission" safely. *Id*. at 354–55 (citations omitted); *see Rodriguez*, 575 U.S. at 355 (officers during traffic stops may check licenses, check for outstanding warrants against the driver, and inspect registration and insurance); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). A stop "may be extended to conduct an investigation into matters other than the original traffic violation" so long as "the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

Here, it is not in dispute that Ranger Fey had a proper basis for his initial stop of the Cadillac and its occupants based on the alleged improper parking. When he first contacted them, Ranger Fey was permitted to ask Ms. Hernandez and Tolmosoff basic questions, such as whether they had identification, whether there were any weapons in the vehicle, and to check for outstanding warrants. *See United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) *cert. denied*, —— S. Ct. ——, Feb. 20, 2024. Such questions are "ordinary inquiries incident to a traffic stop made as part of ensuring that vehicles on the road are operated safely and responsibly, or else are negligibly burdensome precautions that an officer may take in order to complete his mission safely." *Id*. (internal citations omitted).

Tolmosoff argues that Ranger Fey impermissibly extended the stop when he asked her about the presence of marijuana in the car. (Doc. No. 11 at 7). However, as noted below, the "distinct odor of burnt marijuana" that Ranger Fey detected in the air near the vehicle gave him "reasonable suspicion of an independent offense" including potential violations of federal law. Thus, Ranger Fey was justified in investigating the issue further and his questioning did not impermissibly extend the stop.

**B. Whether Rangers Had Probable Cause to Search the Vehicle**

Police may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132, 162 (1925); *see also United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("[Police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime . . . . 'Probable cause to search is evaluated in light of the totality of the circumstances.'") (citations omitted). Whether probable cause exists is determined from the view of the officer on the street, not the judge in a courtroom. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). If there is a "fair probability" that evidence of a crime or contraband would be found in the vehicle, then probable cause to search the vehicle exists. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Ewing*, 638 F.3d 1226, 1231 (9th Cir. 2011). "Under the totality of the circumstances test, otherwise innocent behavior may be indicative of criminality when viewed in context." *United States v. Chavez-Miranda*, 306 F. 3d 973, 978 (9th Cir. 2002). As to the scope of such a search, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825. The automobile exception "is motivated by the supposedly lower expectation of privacy individuals have in their vehicles as well as the mobility of vehicles, which allows evidence contained within those vehicles to be easily concealed from the police." *United States v. Camou*, 773 F.3d 932, 941 (9th Cir. 2014) (citations omitted).

While in California "the smell of marijuana alone no longer provides a basis for probable cause . . . when combined with other factors, the smell of marijuana may still support probable cause that a vehicle contains evidence of marijuana activity that remains unlawful under [federal] law." *See United States v. Vasquez*, 2021 WL 3011997, at *2 (9th Cir. July 15, 2021). The incident here occurred on federal land and given that possession of marijuana remains a federal crime, Ranger Fey had probable cause to believe based on the smell of burnt marijuana and Ms. Hernandez and Tolmosoff's admissions that the car contained "a little bit of marijuana" that the vehicle may contain evidence of criminal activity. *See United States v. Chavez*, 2016 WL 916324, at *2 (E.D. Cal. Mar. 10, 2016) (noting that "even if defendant's actions [of growing

8

1  marijuana for purported medical purposes] were in compliance with California law, they
2  allegedly took place on federal land" and there was no evidence that "Congress intended to affect
3  the federal government's exercise of its police powers over federal land.")

4        Tolmosoff argues that even if a search of the vehicle was justified based on the admitted
5  possession of marijuana, the search should have ended once Ranger Fey found two marijuana
6  cigarettes in a tin box. (Doc. No. 11 at 8). The Court disagrees. As noted above, "[i]f probable
7  cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the
8  vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.
9  Moreover, Hernandez' initial denial of marijuana because she had smoked all of it and
10 Tolmosoff's suggestion of the marijuana's location in the blue bag, further heightened probable
11 cause that additional contraband would be found.

12       Tolmosoff cites to *California v. Acevedo*, 500 U.S. 565 (1991) for support, however the
13 holding in that case supports the Government's position and reaffirmed the Supreme Court's
14 earlier ruling in *Ross*. In *Acevedo*, the defendant visited the home of an individual who was under
15 surveillance by narcotics agents who the agents knew had just received a large shipment of
16 marijuana. *Id*. at 566-67. Acevedo left the suspect's home after about 10 minutes with a paper
17 bag matching the dimensions of the packages of marijuana the suspect had just received. *Id*. at
18 567. Acevedo placed the paper bag in the trunk of his vehicle and left the scene. *Id*. Fearing the
19 loss of evidence, officers in a marked police vehicle stopped Acevedo, opened the trunk and bag,
20 and found marijuana. *Id*. The California Court of Appeal granted a motion to suppress the
21 marijuana, holding that although the officers had probable cause to search a bag within the trunk
22 of the vehicle, they lacked probable cause to search the vehicle itself, following the Supreme
23 Court's holding in *United States v. Chadwick*, 433 U.S. 1 (1977) rather than *United States v.*
24 *Ross*, 456 U.S. 798 (1982). *Id*. at 568. After the California Supreme Court denied a petition for
25 review, the U.S. Supreme Court granted certiorari and reversed. The high court held that rather
26 than applying different rules for a vehicle and a container within a vehicle, "the Carroll Doctrine
27 provid[es] one rule to govern all automobile searches. The police may search an automobile and
28 the containers within it where they have probable cause to believe contraband or evidence is

1   contained." *Id.* at 580.

2   Here, Tolmosoff contends that Ranger Fey's search should have been limited to a
3   particular area of the vehicle, presumably the blue bag where the women told Fey he would find
4   the marijuana cigarettes. However, *Ross* delineates the permissible scope of a vehicle search and
5   provides that Ranger Fey was permitted to search any part of the car that could reveal the object
6   of the search. *Ross*, 456 U.S. at 825. Here, Ranger Fey found the improperly stored "ghost gun"
7   in the trunk of Ms. Tolmosoff's car. (Doc. No. 1-2 at 1). Given that the trunk "reeked" of
8   marijuana and the women had advised Fey he would find marijuana in the trunk, Ranger Fey had
9   probable cause to search the trunk and any containers within it "that may conceal the object of the
10  search." (Exhibit 2 at 46:54–47:13); *Ross*, 456 U.S. at 825; *see also Wyoming v. Houghton*, 526
11  U.S. 295, 301-02 (1999) (noting that where probable cause exists to justify the search of a
12  lawfully stopped vehicle, the probable cause justifies a search of every part of the vehicle that
13  may conceal the object of the search, making no distinction among packages or containers based
14  on ownership). Thus, the Court finds the scope of the search was proper and the items found
15  pursuant to that search should not be suppressed.

16  Alternatively, Tolmosoff contends that the decriminalization of simple marijuana
17  possession in California, various executive actions reflecting de facto decriminalization of simple
18  possession of marijuana, and scarce enforcement by federal prosecutors effectively divested the
19  rangers of probable cause, because the smell of burnt marijuana alone does not indicate that a
20  crime has been or is about to be committed. (Doc. No. 11 at 10-11). As Tolmosoff
21  acknowledges, however, marijuana remains illegal under federal law, (*id*. at 10), the incident
22  occurred on federal land, and Tolmosoff fails to cite any authority to support her contention that
23  the presence of marijuana on federal lands no longer supports probable cause. Even outside of
24  federal lands, the smell of burnt marijuana emanating from a vehicle may support probable cause
25  for a search because the state's legalization scheme does not make all uses or possession of
26  marijuana legal. *See People v. Fews*, 27 Cal. App. 5th 553, 563 (2018) (noting that "[d]riving a
27  motor vehicle on public highways under the influence of any drug . . . or while in possession of
28  an open container of marijuana . . . are not acts 'deemed lawful'" by California's legalization of

recreational marijuana, and thus a smell of recently burnt marijuana in a vehicle warranted further investigation.)  Nor is the Court aware of any such authority.  As the Government notes, while federal prosecutors rarely prosecute marijuana offenses, this is an act of prosecutorial discretion that does not divest law enforcement of authority to investigate potential federal crimes.  (Doc. No. 21 at 19).

Thus, based on the totality of the circumstances, including the admitted possession of marijuana in the vehicle and the odor of burnt marijuana, rangers had probable cause under the automobile exception to effect a search of Tolmosoff's vehicle.

### C. Whether *Miranda* Was Triggered During Defendant's Detention

"The procedural protections afforded by *Miranda v. Arizona*, 384 U.S. 436 (1966), are designed to secure an accused's privilege against self-incrimination and are triggered only in the event of a custodial interrogation." *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985).  "A defendant is in custody when, based upon a review of all the pertinent facts, 'a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981).

In making this determination, courts consider factors including "(1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual." *United States v. Crisco*, 725 F.2d 1228, 1231 (9th Cir. 1984).  Meanwhile, "interrogation may be 'either express questioning or its functional equivalent,' and . . . include[s] any statements or actions 'that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Booth*, 669 F.2d 1231, 1237–38 (9th Cir.1981) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)).

Tolmosoff contends here that "as soon as it became clear that the traffic stop would turn into a drug investigation" she and Ms. Hernandez were in custody.  In support, she cites to the relatively long duration of the encounter (53 minutes), the fact that Ranger Fey was in possession of Tolmosoff and Hernandez's driver's licenses until the search was complete, the presence of

1    two rangers during most of the encounter, and that "the Rangers instructed [Tolmosoff and
2    Hernandez] where to stand, in the cold, on the side of the road for the duration of the vehicle
3    search." (Doc. No. 11 at 12).
4        Roadside questioning of a motorists detained during a traffic stop does not amount to
5    custodial interrogation. *Berkemer v. McCarty*, 468 U.S. 420 (1984).  And an investigative stop is
6    not transformed into and arrest merely because the defendant is detained and told he is not free to
7    leave, or his freedom is restricted during the stop. *United States v. Patterson*, 648 F.2d 625, 633
8    (9th Cir. 1981).  Here, Ranger Fitzgerald advised the women multiples times that they would
9    most likely receive at most a ticket.  The stop took place along a public roadway with several
10   passersby visible during the encounter, rather than in an unfamiliar location with a custodial
11   atmosphere. *See United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) (noting that a
12   "police-dominated" atmosphere and an unfamiliar location tend to support a finding of custody).
13   There was no overt pressure used to detain Tolmosoff and Hernandez, even though it was
14   apparent they were not free to leave until the Rangers' investigation was complete. *See United*
15   *States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001) (noting that a defendant was not in custody
16   where "the defendant merely had been delayed for questioning and the search of her belongings;
17   she was not free to go, but neither was she jailed, handcuffed, or subjected to anything besides
18   inconvenience or delay.") (citing *U.S. v. Leasure*, 122 F.3d 837 (9th Cir. 1999).  Further, the
19   presence of a second ranger was necessary to ensure Ranger Fey could perform a search safely
20   and without interruption and was hardly an excessive show of force that created an intimidating
21   custodial atmosphere.  A review of the body worn camera footage demonstrates that there is no
22   evidence that either of the Rangers used coercion, threats or intimidating language to elicit
23   incriminating information.  To the extent Tolmosoff and Hernandez made any incriminating
24   statements, these were largely not the result of express questioning or its equivalent by either of
25   the Rangers.  *See Innis*, 446 U.S. at 301 (voluntary statements made spontaneously and not in
26   response to custodial interrogation are not subject to suppression under *Miranda*).  Based upon
27   the facts, the Court concludes that a reasonable person in Tolmosoff 's position would conclude
28   considering the short duration and circumstances of the detention, that she was free to leave once

the formalities were concluded.  Thus, the Court finds she was not in custody for purposes of *Miranda* and denies the Motion to Suppress as to any statements made to the Rangers.

## CONCLUSION

Based upon a review of the record and video evidence, the Court finds no basis to suppress the evidence obtained from the search of the vehicle or to suppress Tolmosoff or Hernandez's statements to either Ranger.

Accordingly, it is **ORDERED**:

1,  Defendant Tolmosoff's Motion to Suppress (Doc. No. 11) is **DENIED**.

2.  The Court sets this case for a status conference for June 5, 2024 at 10:00 A.M.

Dated:   May 7, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE